1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3
UNITED STATES OF AMERICA,        )  Docket No. 11 CR 646
4                                )
               Plaintiff,        )  Chicago, Illinois
5                                )  August 28, 2012
          v.                     )  10:13 a.m.
6                                )
JAVON JOHNSON,                   )
7                                )
               Defendant.        )
8

9        TRANSCRIPT OF PROCEEDINGS - Suppression Hearing
           BEFORE THE HONORABLE JOHN W. DARRAH
10

11   APPEARANCES:

12

13   For the Government:      HON. GARY S. SHAPIRO
                            Acting United States Attorney by
                            MS. SHERI H. MECKLENBURG
14                          MR. BOLLING W. HAXALL III
                            Assistant United States Attorneys
15                          219 South Dearborn Street
                            5th Floor
16                          Chicago, Illinois 60604

17
For the Defendant:      JOHN L. SULLIVAN LAW OFFICE by
18                          MR. JOHN L. SULLIVAN
                            349 Park Avenue
19                          Suite 3
                            Glencoe, Illinois 60022-1589
20

21   Also Present:          MR. JAVON JOHNSON

22

23   Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR, CLR
                            Contract Court Reporter
24                          219 S. Dearborn Street, Room 2144A
                            Chicago, Illinois 60604
25                          708.447.0905  laurarenke@hotmail.com

1                           I N D E X

2      WITNESS                                          PAGE

3      PATRICK BAGLEY
            Direct by Mr. Haxall ........................ 8
4           Cross by Mr. Sullivan ...................... 34
            Redirect by Mr. Haxall ..................... 49
5           Recross by Mr. Sullivan .................... 51

6      SHERI MECKLENBURG
            Direct by Mr. Sullivan ..................... 57
7           Cross by Mr. Haxall ........................ 62
            Redirect by Mr. Sullivan ................... 64

8

9

10

11

12                        E X H I B I T S

13     NUMBER                                       ADMITTED

14     Government Exhibit

15          No. 1     ................................... 10
            No. 3     ................................... 24
16          No. 4     ................................... 32

17

18

19

20

21

22

23

24

25

1          (In open court.)

2                THE CLERK:  11 CR 646, United States v. Javon Johnson.

3          (Off-the-record discussion.)

4                MR. HAXALL:  Good morning, your Honor.  Bolling Haxall

5     and Sheri Mecklenburg on behalf of the United States.

6                THE COURT:  Good morning.

7                MS. MECKLENBURG:  Good morning, your Honor.

8                MR. SULLIVAN:  Good morning, your Honor.  John

9     Sullivan on behalf of Javon Johnson, who is present in court.

10               THE COURT:  Good morning, all.

11               THE DEFENDANT:  Good morning, your Honor.

12               THE COURT:  Now, what about this --

13               We're off the record.

14         (Off-the-record discussion.)

15               THE COURT:  This matter comes on for hearing on a

16    motion to suppress.  Is that correct?

17               MR. HAXALL:  Yes, sir.

18               THE COURT:  Okay.  Both sides ready to proceed?

19               MR. SULLIVAN:  Yes.

20               THE COURT:  Just give me about five minutes.

21               MR. SULLIVAN:  Judge, there are, perhaps, a couple

22    other matters you would like to hear about.  Maybe it will

23    be -- it's not going to affect the hearing.

24               I understand the government's going to supersede.

25               THE COURT:  You're going to file a superseding

1     indictment?

2          MR. HAXALL:  That is our intention, your Honor.  So,

3     obviously, in speaking with Mr. Sullivan -- I called him, I

4     believe, about a week -- a week or so ago and informed him of

5     that.  We're within the 30 days for the trial date right now.

6          In speaking with Mr. Sullivan, I believe he's going

7     to --

8          THE COURT:  Do you have any objection, Mr. Sullivan?

9          MR. SULLIVAN:  Judge, I can't object to the

10    superseding indictment because there are some lingering

11    discovery questions.

12         THE COURT:  Do you object to -- are you moving to file

13    a superseding indictment?

14         MR. HAXALL:  I anticipate we will be doing so this

15    afternoon, your Honor.  It's our intention to present it to the

16    grand jury at 4:00 today.

17         THE COURT:  All right.  Okay.  Then you still have

18    your -- you still can object.

19         Now, what was it you wanted to say?

20         MR. SULLIVAN:  Judge, we have some lingering discovery

21    concerns we're trying to work out with the government.  We

22    don't think they'll be resolved by the current trial date.  So

23    we are not prepared to waive proceeding to trial on the

24    superseding indictment in less than 30 days, which means the

25    trial date --

1          THE COURT:  Well, you're going to present this to the

2     grand jury today?

3          MR. HAXALL:  Yes, sir.

4          THE COURT:  So you'll have, if the grand jury decides

5     to grant the superseding indictment -- I should say --

6          Off the record.

7       (Off-the-record discussion.)

8          THE COURT:  But if they -- if the sup -- we're on the

9     record.

10         If the superseding indictment is granted, we'll set

11    this over tomorrow or Thursday for your filing of objections to

12    that.

13         MR. SULLIVAN:  Judge, I don't object to the filing of

14    the superseding indictment.

15         THE COURT:  You object to proceeding to trial based on

16    the superseding indictment.  Is that right?

17         MR. SULLIVAN:  No, Judge.  As I understand it, the law

18    provides that the defendant --

19         THE COURT:  What is it you seek to object to,

20    Mr. Sullivan?

21         MR. SULLIVAN:  We are not waiving the 30-day

22    requirement, that the defendant gets at least 30 days between

23    the superseding indictment and trial.

24         THE COURT:  I see.  And when would 30 days run?

25         MR. HAXALL:  If it's indicted today, your Honor --

```
 1    today is the 28th -- it would be the 28th of September.
 2              THE COURT:  And when is the matter set for trial?
 3              MR. HAXALL:  September 10th.
 4              THE COURT:  Well, can't we just move it back two
 5    weeks?
 6              MR. HAXALL:  I think that's our --
 7              MR. SULLIVAN:  That's what we're talking about.  We're
 8    talking about could we -- are you available October 1st?
 9              THE COURT:  Mel?
10              MR. SULLIVAN:  We've kind of talked about that date.
11              THE CLERK:  For trial?
12              THE COURT:  Yeah.
13              MR. HAXALL:  It would be approximately a two- to
14    three-day trial, your Honor.
15              THE COURT:  A what?
16              MR. HAXALL:  Two- to three-day trial.
17              THE COURT:  Speak to me, Mr. Sullivan.
18              MS. MECKLENBURG:  I think three days.
19              MR. HAXALL:  Three-day.  Three days.
20              THE CLERK:  October 15th is the first available.
21              THE COURT:  We'd have to go to October 28th?  Is that
22    what you're saying?
23              MR. HAXALL:  15th?
24              THE COURT:  No, September 28th.
25              October 15th it is.
```

| | |
|---|---|
| 1 | MR. HAXALL:  Thank you, your Honor. |
| 2 | THE COURT:  Okay. |
| 3 | MR. HAXALL:  We are prepared for the motion to |
| 4 | suppress whenever the Court is ready. |
| 5 | THE COURT:  Okay.  Give me about five minutes. |
| 6 | MR. HAXALL:  Thank you, Judge. |
| 7 | THE COURT:  Thank you. |
| 8 | THE CLERK:  All rise. |
| 9 | (Recess at 10:17 a.m., until 10:27 a.m.) |
| 10 | (Call to order.) |
| 11 | THE CLERK:  11 CR 646, United States v. Javon Johnson. |
| 12 | MR. HAXALL:  Good morning again, your Honor.  Bolling |
| 13 | Haxall and Sheri Mecklenburg on behalf of the United States. |
| 14 | THE COURT:  Good morning. |
| 15 | MS. MECKLENBURG:  Good morning, Judge. |
| 16 | MR. SULLIVAN:  John Sullivan on behalf of Javon |
| 17 | Johnson, who is present in court. |
| 18 | THE COURT:  Mr. Sullivan. |
| 19 | This matter comes on this morning on your motion, |
| 20 | Mr. Sullivan, on behalf of your client to suppress certain |
| 21 | statements purportedly made by your client. |
| 22 | Both sides are ready to proceed? |
| 23 | MR. SULLIVAN:  Yes, sir. |
| 24 | MR. HAXALL:  Yes, Judge. |
| 25 | THE COURT:  Call your first witness, please. |

Bagley - Direct by Haxall

1          MR. HAXALL:  The government would call Agent Pat
2    Bagley.
3          MR. SULLIVAN:  May we sit down, Judge?
4          THE COURT:  Oh, please.  Please do.
5          Would you raise your right hand, please, Agent?
6       (Witness duly sworn and takes the stand.)
7          THE WITNESS:  Yes, sir.
8          THE COURT:  Agent, there's that little lavalier
9    microphone.  If you'd put it on the upper part of your lapel,
10   it would help us hear your testimony.
11         Will you be using any of the visual aids?
12         MR. HAXALL:  No, sir.
13         THE COURT:  Okay.
14         MR. HAXALL:  May I proceed, your Honor?
15         THE COURT:  You may inquire.
16           PATRICK BAGLEY, GOVERNMENT WITNESS, SWORN
17                       DIRECT EXAMINATION
18   BY MR. HAXALL:
19   Q   Sir, can you please state your name and spell your last
20   name for the record.
21   A   Patrick Bagley, B-A-G-L-E-Y.
22   Q   Sir, how are you currently employed?
23   A   I'm a special agent with the Drug Enforcement
24   Administration.
25   Q   How long have you been employed by DEA as a special agent?

Bagley - Direct by Haxall

1    A    16 years.

2    Q    In general terms, what are your duties as a special agent

3    with the DEA?

4    A    To enforce federal and state narcotics violations.

5    Q    Sir, are you familiar with the DEA investigation known as

6    Operation Killer Bees?

7    A    Vaguely.

8    Q    And what was your role in that investigation?

9    A    To participate in a roundup, multiple arrests, on

10   June 21st, 2011.

11   Q    Were you aware that arrest warrants had been issued for

12   numerous individuals as part of Operation Killer Bees?

13   A    Yes.

14   Q    And in particular, were you assigned to arrest one person

15   pursuant to an arrest warrant?

16   A    I was.

17   Q    And who was that?

18   A    Javon Johnson.

19          MR. HAXALL:  May I approach the witness, your Honor?

20          THE COURT:  Certainly.

21   BY MR. HAXALL:

22   Q    Sir, showing you what's been marked as Government

23   Exhibit 1.

24          MR. HAXALL:  For the record, I'd previously shown this

25   to defense counsel.

Bagley - Direct by Haxall

1    BY MR. HAXALL:

2    Q    Do you recognize that item?

3    A    I do.

4    Q    What do you recognize Government Exhibit 1 to be?

5    A    It's a copy of the arrest warrant for Javon Johnson.

6    Q    And did you have that prior to attempting to arrest

7    Mr. Johnson?

8    A    I did.

9    Q    Other than that form being a Xerox copy, the government

10   exhibit sticker, and the rear portion of the search warrant

11   being filled in after the arrest, is that in the same or

12   substantially the same form as when you had it on that date?

13   A    Yes, sir.

14          MR. HAXALL:  Your Honor, at this time the government

15   would seek to admit Government Exhibit 1 into evidence.

16          MR. SULLIVAN:  No objection.

17          THE COURT:  Government 1 is admitted.

18      (Government Exhibit 1 admitted in evidence.)

19   BY MR. HAXALL:

20   Q    Sir, I'd like to call your attention, then, to June 21st,

21   2011, at approximately 9:30 in the morning.  Did you go to a

22   certain location at that time?

23   A    Yes.

24   Q    And was that in the area of 11242 South Homewood Avenue in

25   Chicago?

Bagley - Direct by Haxall

1    A    It was.

2    Q    Why did you go to that location?

3    A    A Chicago Police Department narcotics team that we were

4    working with advised me that they had Mr. Johnson at the house.

5    Q    And are you aware of whose residence that is?

6    A    Yes.

7    Q    And whose residence was that?

8    A    Mr. Johnson's sister's.

9    Q    So did you proceed to that address?

10   A    I did.

11   Q    And when you arrived, what did you find?

12   A    Mr. Johnson was in the house.

13   Q    Was he with anyone else?

14   A    He had some family there.  There were plainclothes police

15   officers there.

16   Q    Was he in custody of CPD officers at that time?

17   A    Yes.

18   Q    The individual that was in the custody of the Chicago

19   Police Department on that date and time, do you see that person

20   present in court today?

21   A    I do.

22   Q    Can you please point to that person and describe an article

23   of clothing that person is wearing.

24   A    It's the gentleman in the orange shirt.

25            MR. HAXALL:  Your Honor, if the record could reflect

Bagley - Direct by Haxall

1    the witness has identified the defendant, Javon Johnson.

2             THE COURT:  The record will so --

3             Any objection, Mr. Sullivan?

4             MR. SULLIVAN:  No objection.

5             THE COURT:  The record will so reflect.

6             Slow down just a little bit, will you?

7             MR. HAXALL:  Yes, sir.  I apologize.

8    BY MR. HAXALL:

9    Q    After arriving at the defendant's sister's house, did you

10   take the defendant into custody?

11   A    I did.

12   Q    At some point did you show the defendant a copy of the

13   arrest warrant, which has previously been admitted into

14   evidence?

15   A    I did.  I told him he had a federal arrest warrant for

16   him -- for him, and I showed him a copy of the warrant.

17   Q    At some point did he ask you why he was being arrested?

18   A    He did.

19   Q    What did he say, and what was your response?

20   A    He asked me what the warrant was for.  I told him I didn't

21   really know, just there was a federal arrest warrant for him.

22   Q    At that point in time, did you ask the defendant any

23   questions about this investigation?

24   A    I did not.

25   Q    What did you do next?

Bagley - Direct by Haxall

1    A    I then walked him outside and put him in the rear seat of
2    my government vehicle.
3    Q    And what kind of car were you driving that day?
4    A    Lincoln Navigator.
5    Q    And where in the car did you seat the defendant?
6    A    Rear seat behind the passenger.
7    Q    Was he handcuffed?
8    A    Yes.
9    Q    Where did you sit in the car?
10   A    Driver's seat.
11   Q    Was there anyone else in the area of the car with you?
12   A    Yes.
13   Q    Who was that?
14   A    Task Force Officer Jon Mannino.
15   Q    What, if anything, did you say to the defendant after you
16   placed him into your car?
17            THE COURT:  Excuse me.
18            Where was the other officer?  Was he in the front seat
19   with you?
20            THE WITNESS:  He may have been in either the front
21   seat or standing outside the open passenger window.  Not sure.
22            THE COURT:  And what was his name again?
23            THE WITNESS:  Jon Mannino.
24            THE COURT:  Okay.
25            MR. HAXALL:  Thank you.

Bagley - Direct by Haxall

BY MR. HAXALL:

Q    And after placing the defendant into your car, what did you say or do next?

A    I told him I was going to play a -- play a CD through the car speakers.

Q    And at the time you did this, were you still parked in the area of the defendant's sister's home?

A    Yes.

Q    In general terms, what was contained on the CD that you told the defendant you were going to play for him?

A    There were approximately five recorded phone calls on that CD.

Q    What was the approximate length of the CD?

A    Approximately five minutes for the whole CD.

Q    And did the CD of the phone calls -- where did you receive it?

A    I received it the day before at the briefing about the roundup.

Q    What were you directed to do with the CD?

A    I was directed to listen to the CD the day before to do a voice identification of the person -- my person being Mr. Johnson -- to do a voice identification when he was arrested.

Q    Now, prior to playing the CD for the defendant, did you provide him his *Miranda* rights?

Bagley - Direct by Haxall

1    A    I did not.

2    Q    Why not?

3    A    I had no intention of asking him any questions.

4    Q    At that time, did you play the CD for the defendant to

5    hear?

6    A    I did.

7    Q    What, if anything, did he say?

8    A    He said:  "I shouldn't have fucked with that motherfucker.

9    He's the police."

10            THE COURT:  Hold on a second.

11            What was it he said, sir?

12            THE WITNESS:  I'm sorry?

13            THE COURT:  What was it he said?

14            THE WITNESS:  "I shouldn't have fucked with that

15    motherfucker.  He's the police."

16            THE COURT:  You may proceed, Mr. Haxall.

17            MR. HAXALL:  Thank you.

18    BY MR. HAXALL:

19    Q    The defendant's statement, was that a response to any

20    question you had posed to him?

21    A    It was not.

22    Q    After the defendant made that statement, did you ask him a

23    follow-up question?

24    A    I did not.

25    Q    Did you hear Officer Mannino either prior to playing the CD

Bagley - Direct by Haxall

1    for the defendant or after ask any questions of the defendant

2    about the investigation?

3    A    I did not.

4    Q    Did the defendant make further statements about the

5    investigation at that time?

6    A    He did not.

7    Q    Did you tell the defendant what would happen next?

8    A    Yes.

9    Q    What did you say to the defendant?

10   A    I told him I was going to transport him to the Chicago

11   Police Department's Homan Square facility where he was going to

12   be processed and then brought in front of a federal judge later

13   that day.

14   Q    Did the defendant make any statement in response to what

15   you told him?

16   A    No, he did not.

17   Q    At that time, what did you do?

18   A    I then drove him to the Chicago Police Department's Homan

19   Square facility.

20   Q    And is that facility located approximately at the

21   1000 block of South Homan Avenue in Chicago?

22   A    Yes, it is.

23   Q    Since you arrested the defendant in the area of 11 -- the

24   11000 block of South Homewood Avenue, is it fair to say that

25   it's at least -- or approximately 100 blocks from where you

Bagley - Direct by Haxall

1  arrested the defendant to where you transported him?

2  A    He was arrested on, yeah, the 11200 block of Homewood

3  Avenue, and I drove directly to the Homan Square facility.

4  Q    Do you recall approximately how long that drive took?

5  A    I don't.  It was morning traffic.  We drove directly there.

6  I don't recall the approximate time.

7  Q    Is it safe to say it took more than ten minutes and less

8  than an hour?

9  A    Yes, sir.

10  Q    While transporting the defendant to Homan Square, did you

11  ask any questions of him about the investigation?

12  A    I did not.

13  Q    Did you hear Officer Mannino or anyone else do so?

14  A    No.

15            THE COURT:  Hold on a second.

16            The last I heard, Officer Mannino was outside the

17  vehicle.  Did he enter the vehicle?

18            THE WITNESS:  Yes, sir.

19            THE COURT:  When did he do that?

20            THE WITNESS:  I don't recall if it was during or -- or

21  after.

22            THE COURT:  During or after what?

23            THE WITNESS:  The playing of the CD.

24            THE COURT:  Was Officer Mannino within earshot of that

25  CD?  Could he have heard -- could he hear that?

Bagley - Direct by Haxall

1      Where was he standing when he was outside the vehicle?

2      THE WITNESS:  The driver -- the passenger window was

3  open, and he was leaning in the passenger window of the

4  vehicle.

5      THE COURT:  So he was either outside the vehicle able

6  to hear the CD or inside the vehicle.

7      THE WITNESS:  Yes, sir.

8      THE COURT:  Okay.  And is it your testimony that when

9  you arrived at the Homan police station that Officer Mannino

10  was with you?

11      THE WITNESS:  I believe he was, but I'm not a hundred

12  percent.

13      THE COURT:  Okay.

14      You may proceed.

15      MR. HAXALL:  Thank you.

16  BY MR. HAXALL:

17  Q    Is it possible that you may have dropped Officer Mannino

18  off at another police facility prior to traveling to Homan

19  Square?

20  A    What I know for sure is that I -- I walked Mr. Johnson up

21  myself because Task Force Officer Mannino had his car in the

22  Homan Square parking lot.  So I dropped him off by his car, and

23  then I proceeded into the garage area at Homan Square and

24  brought Mr. Johnson out.

25  Q    So it's safe to say there was a period of time that Officer

Bagley - Direct by Haxall

1  Mannino was in the car with you and the defendant and also a

2  period of time that you were alone with the defendant?

3  A    Yes.

4  Q    During the period of time that Officer Mannino was with you

5  and the defendant traveling from where the defendant was

6  arrested to Homan Square, did you hear Officer Mannino ask the

7  defendant any questions about the investigation or the arrest?

8  A    I did not.

9  Q    And did you ask the defendant -- during the entire time

10 after he made his initial statement in your car until he was

11 transported to Homan Square, did the defendant make any

12 additional statements about the investigation?

13 A    No, he did not.

14 Q    Did you ask him any other questions about the

15 investigation?

16 A    No, I did not.

17 Q    Now, after arriving at Homan Square, what did you do with

18 the defendant?

19 A    He was brought up to a processing area where I completed

20 paperwork relative to his arrest.

21 Q    And in completing that paperwork, did you ask the defendant

22 certain biographical questions?

23 A    Yes, I did.

24 Q    Did you ask him any questions about the case?

25 A    No, I did not.

Bagley - Direct by Haxall

1   Q    Now, other than asking the defendant biographical

2   questions, was there anything else done to the defendant with

3   respect to booking him?

4   A    Yes.

5   Q    And what was that?

6   A    Fingerprints, photographs, other just general processing.

7   Q    Approximately how long did this processing of the defendant

8   take?

9   A    Half hour to an hour.  It was kind of crowded in there.

10  Q    Did you complete any forms based on the information the

11  defendant provided to you during this processing?

12  A    Yes.

13  Q    And what was that?

14  A    It's a DEA Form 202, which is a Personal History Report

15  that we complete on every person that's arrested.

16  Q    And how did you complete the form that day?

17  A    I handwrote the form.

18  Q    And what did you do with the information afterwards?

19  A    I brought it back to my office.

20  Q    Okay.  And then?

21  A    I then inputted that information into our computer on a DEA

22  Form 202 and then printed that information out --

23           MR. HAXALL:  May I approach?

24           THE WITNESS:  -- and had it approved.

25           MR. HAXALL:  Oh.

Bagley - Direct by Haxall

1              THE COURT:  Sure.

2              MR. HAXALL:  Thank you.

3    BY MR. HAXALL:

4    Q    Showing you what's been marked as Government Exhibit 2, a

5    two-page document.  Do you recognize that item?

6    A    I do.

7    Q    What do you recognize Government Exhibit 2 to be?

8    A    It's a DEA Form 202, Personal History Report, for Javon

9    Johnson.

10   Q    Now, is that the same form that you completed the day of

11   Mr. Johnson's arrest?

12   A    No.

13   Q    How is it different?

14   A    This is typed.

15   Q    So is the information on Government Exhibit 2 the same

16   information that the defendant provided to you during the

17   processing?

18   A    Yes.

19              MR. HAXALL:  Your Honor --

20   BY MR. HAXALL:

21   Q    Other than a sticker being on that exhibit and it being a

22   photocopy, is that the same form as when you completed the 202

23   based on the information the defendant provided during booking?

24   A    Yes, sir.

25              MR. HAXALL:  Your Honor, the government would seek to

Bagley - Direct by Haxall

1    admit Government Exhibit 2 into evidence.

2            MR. SULLIVAN:  No objection.

3            THE COURT:  Okay.  Who typed this Government

4    Exhibit 2, Agent?

5            THE WITNESS:  I did, sir.

6            THE COURT:  And you typed it from the information that

7    you had put on the handwritten version of that form.  Is that

8    right?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  Okay.  When did you do this?

11           THE WITNESS:  When did I type it?

12           THE COURT:  Yeah.

13           THE WITNESS:  It would have been two days later, I

14   believe, is when the signature --

15           THE COURT:  Thank you.

16           THE WITNESS:  -- line indicates.

17           THE COURT:  Thank you.

18           MR. HAXALL:  Thank you.

19   BY MR. HAXALL:

20   Q    Now, during the booking and processing procedure, did you

21   ask the defendant any questions about the investigation?

22   A    No, I did not.

23   Q    Did you hear anyone else do so?

24   A    No, I did not.

25   Q    Did the defendant make any statements pertinent to the

Bagley - Direct by Haxall

1    investigation?

2    A    No, he did not.

3    Q    Now, after completing the booking and processing of the

4    defendant, what did you do with him next?

5    A    I told him I was going to have him read his *Miranda* rights.

6    Q    And how did you do that?

7    A    I had a blank *Miranda* form.  I asked him if he could read

8    it.  He said he could.  He then proceeded to read it.

9    Q    And after reading the advice form, what happened next?

10   A    There's lines.  There's different sentences.  He initialed

11   by each sentence.  Then there's two questions.  He answered

12   those questions.  And then I asked him if he wanted to answer

13   questions, and he replied that he did.

14   Q    Showing you what's been marked as Government Exhibit 3.  Do

15   you recognize that item?

16   A    I do.

17   Q    What do you recognize Government Exhibit 3 to be?

18   A    It's an Advice of Rights/Waiver.

19   Q    Is that the same rights/waiver that you went over with the

20   defendant on that date?

21   A    Yes.  This is signed by Mr. Johnson.

22   Q    And --

23            THE COURT:  Hold on a second.

24            You say you went over it with him.  You gave it to

25   him, and you asked him to read it.  Is that right?

Bagley - Direct by Haxall

1            THE WITNESS:  Yes, sir.

2            THE COURT:  Okay.

3            You're moving admission of Government's Exhibit 3?

4            MR. HAXALL:  Yes, Judge, I am.

5            THE COURT:  Any objection?

6            MR. SULLIVAN:  No objection.

7            THE COURT:  Okay.

8        (Government Exhibit 3 admitted in evidence.)

9    BY MR. HAXALL:

10   Q    Approximately what time did you provide the rights/waiver

11   to Mr. Johnson?

12   A    Approximately 10:50 a.m.

13   Q    So is that about an hour 20 approximately after he was

14   initially arrested?

15   A    Correct.

16   Q    Now, after the defendant signed the rights/waiver in

17   Government Exhibit 3, did you have a conversation with the

18   defendant about the investigation?

19   A    Yes.

20   Q    Without getting into the content of that investigation, at

21   some point did you replay the CD containing the phone calls for

22   him?

23   A    Yes.  He asked me if he could listen to the CD again.

24   Q    So that was his request?

25   A    It was, yes.

Bagley - Direct by Haxall

1    Q    And did you play the CD for him at that time?

2    A    I did.

3    Q    At some point was the interview with the defendant

4    concluded?

5    A    Yes.

6    Q    How so?

7    A    He told me he didn't want to answer any ques -- any more

8    questions.

9    Q    And did you stop the interview?

10   A    I did.

11   Q    What did you do with Mr. Johnson then?

12   A    He was then eventually brought to this building for his

13   initial appearance.

14   Q    And were you the agent that transported the defendant to

15   the building?

16   A    I was.

17   Q    From the time that the defendant indicated he didn't want

18   to answer any more questions to the time you transported him to

19   219 South Dearborn for his initial appearance, did you ask the

20   defendant any more questions about this investigation?

21   A    No, I did not.

22   Q    Did you hear anyone else do so?

23   A    No, I did not.

24   Q    Did the defendant make any statements to you or to anyone

25   else that you heard about this investigation?

Bagley - Direct by Haxall

1    A    No, he did not.

2    Q    Now, when the defendant indicated he didn't want to talk

3    anymore about this case, did he indicate that he might have

4    some information about non-DEA cases?

5    A    He said he had some information --

6          THE COURT:  Hold on a second.  Wait a minute.  Wait.

7          When did this conversation take place?

8          MR. HAXALL:  I'll clarify that, your Honor.

9          THE COURT:  Would you, please?

10         Here's what I heard: that he sat down and talked to --

11   you Mirandized the defendant, apparently, and then spoke to the

12   defendant about the investigation.

13         And then you said without going into what he said.

14   And then the defendant asked to hear the CD; it was played for

15   him.  And the defendant answered no more questions and made no

16   more statements.

17         Now, apparently, he made some statements.  When did

18   this take place?

19         MR. HAXALL:  I'll have to clarify that, your Honor.

20         THE COURT:  Okay.

21   BY MR. HAXALL:

22   Q    During the course of your interview with the defendant, you

23   discussed this investigation.  Is that correct?

24   A    Yes.

25   Q    Did the defendant also indicate that he had information

Bagley - Direct by Haxall

1   beyond the DEA investigation that he might want to share?

2   A    Yes.

3   Q    Was that before or after he asked to not talk anymore about

4   this case?

5   A    Same time, he mentioned he had some information about some

6   homicides and that he didn't want to answer any more questions

7   about this case.

8   Q    And after the defendant said that, what did you do?

9   A    I said okay.

10  Q    Did you tell anybody that the defendant may have

11  information on other investigations?

12  A    I did, yes.

13  Q    Who did you tell?

14  A    I believe I told the case agent and the U.S. Attorney or

15  U.S. Attorneys that were at -- that were there.

16  Q    But did you ask the defendant any more questions about this

17  case?

18  A    No, I did not.

19  Q    Did you ask him any questions about the potential homicides

20  he might have information?

21  A    No, I did not.

22  Q    Are you aware if anyone else ever talked to him about

23  those?

24  A    I don't know.

25       MR. HAXALL:  If I can have a moment, please, your

Bagley - Direct by Haxall

1    Honor.

2            THE COURT:  Before you go, what statements are you

3    seeking to use at trial?

4            MR. HAXALL:  Your Honor, we are seeking to use his

5    statement in the car.  We are seeking to use his statements

6    that he made during the interview.  I don't believe --

7            THE COURT:  All right.  Why don't you tell us what

8    statements he made during the interview.  Why don't you say --

9    you testified that you gave him Government Exhibit 3, Agent.

10   That's the Advice of Rights/Waiver.

11           THE WITNESS:  Yes, sir.

12           THE COURT:  And then after he read that, you said that

13   you then spoke to him about the investigation.

14           THE WITNESS:  Yes.

15           THE COURT:  Tell us everything you said to him and

16   everything he said to you.

17           THE WITNESS:  I believe we initially talked about what

18   was -- the items that were seized at the house.  There were

19   some phones, bulletproof vest.

20           He said the phones weren't -- weren't his.  But he

21   provided me a -- he paid the bill for one of the phones.  He

22   provided me with a phone number and the access code for the

23   iPhone.

24           He told me the bulletproof vest wasn't his.

25           When we listened -- when we listened to the CD again,

Bagley - Direct by Haxall

1  I asked him who the other voice was.  He told me the other

2  voice -- who the other voice was on the -- on the CD.

3  BY MR. HAXALL:

4  Q   Did he identify that person as Luis Gambina?

5  A   I believe he said "Gambino."

6  Q   Did you also ask the defendant to identify any photographs?

7  A   I did.

8  Q   How did you do that, and what did he say?

9  A   It was a booklet of photographs.  I had him look through it

10  to see if he recognized anybody.

11  Q   And did he indicate that he recognized anyone?

12  A   He did.

13  Q   How did he do so?

14  A   He looked at the photograph.  I believe he initialed it,

15  dated it, and then he wrote "Gambino" under the photograph, to

16  the best of my rec -- recollection.

17        THE COURT:  Well, whose photograph was that?

18        THE WITNESS:  Your Honor, I don't -- I don't know.

19        THE COURT:  I see.

20        Did you write any of this down, what he said to you?

21        THE WITNESS:  Yes.

22        THE COURT:  Do you have that?

23        THE WITNESS:  Pardon me?

24        THE COURT:  Do you have a copy of that?

25        THE WITNESS:  My notes?

Bagley - Direct by Haxall

1          THE COURT:  Yes.

2          THE WITNESS:  No, your Honor.  I checked; I can't find

3    my notes.

4          THE COURT:  Do you have any written record of what he

5    told you?

6          THE WITNESS:  I cannot find my notes, so no.

7    BY MR. HAXALL:

8    Q    Agent, are you aware if the report was prepared, including

9    the information that the defendant provided to you during

10   these -- during this interview?

11   A    Yes.

12         THE COURT:  Was it more than one photograph he

13   identified?

14         THE WITNESS:  No, I believe it was only one

15   photograph.

16         MR. HAXALL:  Your Honor, if I -- I'll show counsel

17   first.  I'll mark it as Government Exhibit 4.

18   BY MR. HAXALL:

19   Q    Sir, do you recognize this item?

20   A    Correct.  This is a booklet that I had Mr. Johnson look

21   through, booklet of photographs.

22   Q    Is it a copy of the booklet you showed him?

23   A    It is.

24   Q    And how many -- I ask you to flip through it.  Do you see

25   the photograph that -- that the defendant identified?

Bagley - Direct by Haxall

1    A    I do.

2    Q    And how did he identify that photograph specifically?

3    A    His initials, the date, and then he wrote "Gambino" under

4    the photograph.

5    Q    Are there -- as you flip through that booklet, were there

6    any other photographs --

7              THE COURT:  Hold on a second.  Wait.

8              I asked you who did he identify, and you said you

9    didn't know.

10             THE WITNESS:  I don't know this gentleman's name who

11   he identified.

12             THE COURT:  What name did the defendant write on it?

13             THE WITNESS:  He wrote "Gambino."

14             THE COURT:  Okay.

15   BY MR. HAXALL:

16   Q    Are there any other photographs that the defendant

17   identified during the interview at Homan Square?

18   A    No, sir.

19   Q    Other than now my handwriting, Government Exhibit 4, and

20   that being a Xerox copy of the photographs that you showed to

21   the defendant, is that in the same or substantially the same

22   condition as when you showed it to the defendant and he

23   selected and identified the one photograph as you described?

24   A    Yes, sir.

25             MR. HAXALL:  Your Honor, at this time the government

Bagley - Direct by Haxall

1    seeks to admit Government Exhibit 4.

2              THE COURT:  Any objection?

3              MR. SULLIVAN:  No objection.

4              THE COURT:  Government Exhibit 4 is admitted.

5         (Government Exhibit 4 admitted in evidence.)

6              THE COURT:  Can you remember anything else he told you

7    during that interview, Agent?

8              THE WITNESS:  No, sir, I can't.

9              THE COURT:  Okay.

10   BY MR. HAXALL:

11   Q    Sir, is your memory exhausted as to what the defendant told

12   you during that interview?

13   A    Yes.

14   Q    Is there anything that would assist you in refreshing your

15   recollection about what the defendant told you during that

16   interview?

17   A    I wrote a report about the -- about the interview.  My

18   report would refresh my memory.

19   Q    Showing you what's been marked as Government Exhibit 5.  Do

20   you recognize that item?

21   A    Thank you.

22   Q    Do you recognize that?

23   A    Yes, I do.

24   Q    What is that?

25   A    It's my report from the interview of Mr. Johnson.

Bagley - Direct by Haxall

1    Q    Will that assist you to refresh your recollection about

2    anything else the defendant might have told you during the

3    interview?

4    A    Yes.

5              THE COURT:  Agent, I asked you if you made any record

6    of what he told you, and you told me your notes, but you lost

7    them.

8              THE WITNESS:  I was -- my understanding, that you were

9    asking me about my notes, the notes I took --

10             THE COURT:  I asked you if you had any record --

11             THE WITNESS:  -- from that interview.

12             THE COURT:  -- any record of what he told you.

13             THE WITNESS:  I was assuming you were talking about my

14   notes.

15             THE COURT:  Well, is this a record of what he told

16   you?

17             THE WITNESS:  This is the report, correct.

18             THE COURT:  And where did you get that from?  Where

19   did you get that information from?

20             THE WITNESS:  The information in this report?

21             THE COURT:  Yes.

22             THE WITNESS:  From my notes.

23             THE COURT:  I see.

24   BY MR. HAXALL:

25   Q    Will that assist you to refresh your recollection, sir?

Bagley - Cross by Sullivan

1    A    Yes.

2    Q    If you could please review that and let me know when your

3    recollection has been refreshed.

4    A    Okay.

5    Q    Take that back from you.

6         What else, if anything -- I'm sorry.  First, is your

7    recollection refreshed?

8    A    Yes, sir.

9    Q    What else, if anything, did the defendant tell you during

10   that interview?

11   A    When he identified Gambino in the photograph, he stated,

12   "That's my guy."

13        MR. HAXALL:  Unless the Court has more questions, your

14   Honor --

15        THE COURT:  No, I'm fine.

16        MR. HAXALL:  Thank you.

17        THE COURT:  Anything further, Mr. Haxall?  Mr. Haxall,

18   anything further?

19        MR. HAXALL:  Oh, I'm sorry.  No other questions, your

20   Honor.

21        THE COURT:  Mr. Sullivan.

22        MR. SULLIVAN:  Thank you, your Honor.

23                         CROSS-EXAMINATION

24   BY MR. SULLIVAN:

25   Q    Agent Bagley, were you involved -- well, you say you were

Bagley - Cross by Sullivan

1    involved in Operation Killer Bee, correct?

2    A    I'm sorry?

3    Q    You were involved in Operation Killer Bees?

4    A    I was involved in the takedown.

5    Q    Okay.  At the time of the takedown, did you know that

6    Operation Killer Bees had involved a large number of recorded

7    telephone conversations?

8    A    Yes.  Yes, I believe I did.

9    Q    And there were, perhaps, thousands of conversations out

10   there they were trying to identify who the speaker was?

11   A    I don't know.

12   Q    Okay.  But at some point in time you say before you went

13   out on the street on the 20th -- let me see if I've got the

14   date -- 20th of June 2012, somebody else approached you and

15   gave you a CD, correct?

16   A    The arrest was on June 21st, 2011.

17            I received a CD the day before, which would have been

18   June 20th.

19   Q    Who gave it to you?

20   A    One of the U.S. Attorneys.

21   Q    One of the U.S. Attorneys.  One of the U.S. Attorneys here

22   in the courtroom?

23   A    Yes.

24   Q    When they gave it to you, did they -- did you -- they tell

25   you what it was for?

Bagley - Cross by Sullivan

1    A    It was the arrest packet of the person that there was the

2    federal arrest warrant for.

3    Q    Okay.  Did you need a CD in order to arrest that person?

4              MR. HAXALL:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  We were asked to listen to the CD.

7    BY MR. SULLIVAN:

8    Q    Okay.  Who asked you to listen to the CD?

9    A    U.S. Attorneys.

10   Q    Okay.  Do you know what specific U.S. Attorney was

11   directing you to listen to the CD?

12   A    Yes.

13   Q    Who was it?

14   A    Sheri.

15   Q    Sheri Mecklenburg?

16   A    Yes, sir.

17   Q    Okay.  She directed you to listen to the CD?

18   A    Correct.

19   Q    And did she tell you for what purpose you were listening to

20   the CD?

21   A    Listen to the CD to do a voice ID.

22   Q    To do a voice ID?  Do you know what a voice ID is?

23   A    I'm sorry?

24   Q    Do you know what a voice identification is?

25   A    Yes, I do.

Bagley - Cross by Sullivan

1   Q    What is it?

2   A    It's to identify someone that's on a recorded call or a

3   wire, to then actually talk to that person and try and ID if

4   they're the same people.

5   Q    Okay.  At the time you received that CD in the arrest

6   package on the 20th of June 2011, you had no idea what

7   Mr. Johnson's voice sounded like, did you?

8   A    That's correct.

9   Q    So you listened to the CD how many times?

10  A    I listened to it on the 20th after I got it, three, four

11  times.

12  Q    And when you -- when it was given to you by

13  Ms. Mecklenburg, did she tell you, other than listening to it,

14  what you were supposed to do with it once you arrested

15  Mr. Johnson?

16  A    To play the CD.

17  Q    She told you to play it for him?

18  A    Yes.

19  Q    Did she tell you when to play it for him?

20  A    I don't recall.

21  Q    Okay.  Did you have any other equipment capable of playing

22  a CD on the day of the arrest other than the CD I presume you

23  had in the car?

24  A    No, I did not.

25  Q    So --

Bagley - Cross by Sullivan

1          THE COURT:  Excuse me.  Can I hear that question

2    again?

3    BY MR. SULLIVAN:

4    Q    Did you have any other equipment --

5          MR. SULLIVAN:  Oh, I'll say it again, Judge, if you'd

6    like.

7    BY MR. SULLIVAN:

8    Q    Did you have any other CD equipment that you could have

9    played the CD on other than the CD in the player in the

10   automobile?

11   A    No, I did not.

12   Q    Okay.  So --

13         THE COURT:  In other words, you used the CD player in

14   the automobile, right?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Okay.

17   BY MR. SULLIVAN:

18   Q    And the government -- in the arrest package, the Assistant

19   U.S. Attorney didn't give you another CD player that you could

20   have used at another time and place?

21   A    I didn't get one, no.

22   Q    Now, did Ms. Mecklenburg tell you why she wanted you to

23   play the tape for the -- play the CD in the car for Mr. Johnson

24   after you arrested him?

25   A    I don't believe she told me that.

Bagley - Cross by Sullivan

1  Q    Okay.  Did you understand why you were to play it for him

2  in the car?

3  A    To -- I'm sorry.  Ask the question again.

4  Q    Do you know, why did you play it for him in the car?

5  A    Why did I play it for him in the car?

6  Q    Yes.

7  A    So he could listen to it.

8  Q    Okay.  But did it matter to you whether he heard it or not?

9  A    He was asking me why he was arrested.

10  Q    And you told him you had a federal warrant, correct?

11  A    Correct.

12  Q    He didn't ask you what was the evidence against him, did

13  he?

14  A    I -- I don't recall.

15  Q    Okay.  And at the time you played the tape in the car, you

16  wanted to hear his voice, correct?

17  A    I had already listened to the tape.  I already heard his

18  voice.

19  Q    But you didn't know that was his voice on the tape -- or on

20  the disc at the time you heard it, did you?

21  A    I don't understand the question.

22  Q    At the time you listened -- at the time you received the

23  CD, all you knew was there were two -- at least two people

24  speaking in the recorded conversations, correct?

25  A    Yes, sir.

Bagley - Cross by Sullivan

1    Q    You didn't know whose voices -- which persons those voices

2    belonged to.

3    A    Correct.

4    Q    Okay.  So when you played the CD in the car, in the Lincoln

5    Navigator, you wanted to hear Mr. Johnson's voice to see if it

6    was one of the voices in the CD, correct?

7    A    Well, at that point I haven't -- my interaction with

8    Mr. Johnson was minutes.  I haven't -- I couldn't really listen

9    to his voice, his own voice.  So playing a CD wasn't for -- for

10   me.  I wouldn't have been able to do a voice ID at that point.

11   Q    But -- I understand.  At that point.

12        But you played the tape so that in response, you could

13   hear Mr. Johnson's voice, correct?

14   A    In response to what?

15   Q    In response to the CD.

16   A    I'm not -- I'm not understanding your question.

17   Q    Did you anticipate at the time you played the CD in the

18   Lincoln Navigator that Mr. Johnson would say something so you

19   could hear his voice and compare it to what you'd been

20   listening to on the CD?

21   A    No, not at all.

22   Q    That wasn't the purpose for which you played the CD?

23   A    No, not at all.

24   Q    For what purpose did you play the CD then?

25   A    So he could listen to it.

Bagley - Cross by Sullivan

1   Q   And is it -- is there a federal rule that says you have to

2   play the defendant the CD so that he can hear it at the time of

3   his arrest?

4            MR. HAXALL:  Objection.

5            THE COURT:  Overruled.

6            THE WITNESS:  Not to my knowledge.

7            THE COURT:  Let me ask a question.  You were given a

8   CD so that you could identify Mr. Johnson's voice.  Is that

9   your testimony?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Go ahead, Mr. Sullivan.

12   BY MR. SULLIVAN:

13   Q   In order to identify Mr. Johnson's voice on that CD, you

14   had to hear the man you had in the back of your car -- you had

15   to hear him say something, correct?

16   A   No, sir.  Not at that point.  Absolutely not.

17           THE COURT:  Could I see a copy of the warrant, please?

18           THE WITNESS:  Want this one, your Honor?

19           THE COURT:  I don't know if you have it up here,

20   Agent, or not.

21           THE WITNESS:  I believe I do.

22           THE COURT:  That's 1.

23           THE WITNESS:  Here you go, sir.

24           THE COURT:  Thanks.

25           Thanks.

Bagley - Cross by Sullivan

1    THE WITNESS:  Thank you, sir.

2    THE COURT:  Mm-hmm.

3    You may proceed, Mr. Sullivan.

4  BY MR. SULLIVAN:

5  Q    You're familiar with *Miranda* warnings, are you not, sir?

6  A    Yes, sir.

7  Q    And did you -- is it routine in the DEA to give *Miranda*

8  warnings to an individual immediately after they are arrested?

9    MR. HAXALL:  Objection.

10    THE COURT:  Overruled.

11    THE WITNESS:  I can speak for me personally.  I don't.

12  I don't give *Miranda* until I'm going to ask -- ask whoever I'm

13  arresting questions.

14  BY MR. SULLIVAN:

15  Q    All right.  So you did not -- you specifically did not give

16  Mr. Johnson his *Miranda* warnings when you put him in the car,

17  even though he was in custody, correct?

18  A    That's correct.

19  Q    He was under arrest at the time you put him in the car.

20  A    Yes, he was.

21  Q    And you played the disc with the recordings on it simply

22  for the fact you wanted him to hear it, correct?

23  A    That's why I played the CD.  That's correct.

24  Q    And for no other reason.

25  A    That's correct.

Bagley - Cross by Sullivan

1   Q    Now, do you know the *Miranda* warnings from memory?

2              MR. HAXALL:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Verbatim, no.  I have -- I keep a card.

5   I don't have sheets.

6   BY MR. SULLIVAN:

7   Q    Do you know what the first line of the *Miranda* warning is?

8              MR. HAXALL:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  I believe so, yeah.

11  BY MR. SULLIVAN:

12  Q    What is it?

13  A    I think it's "You have the right to remain silent."

14  Q    Yes, I believe that is correct.

15             If you had told that to Mr. Johnson, you wouldn't have

16  had the opportunity to hear his voice if he had remained

17  silent, would you?

18             MR. HAXALL:  Objection.  Hypotheticals, your Honor.

19  He's asking this witness to opine what the defendant would have

20  done.

21             THE COURT:  I'll sustain that.  But I --

22  BY MR. SULLIVAN:

23  Q    Sir --

24             THE COURT:  -- I will take judicial notice of the fact

25  that if someone doesn't speak, you couldn't hear his voice.

Bagley - Cross by Sullivan

1          MR. SULLIVAN:  Thank you.

2    BY MR. SULLIVAN:

3    Q   And, sir, you did not want Mr. Johnson -- I'll put it you

4    did not want Mr. Johnson to clam up and not say anything when

5    you put him in the car.  Isn't that correct?

6    A   I did not -- it didn't -- it didn't make a difference if he

7    didn't say anything or he did say anything.  It didn't make a

8    difference at all.  He -- it didn't make a difference at all to

9    me.

10   Q   But Ms. Mecklenburg gave you an arrest packet with a CD in

11   it and told you the purpose of the CD was to identify Mr. Javon

12   Johnson's voice, correct?

13   A   That's correct.

14   Q   But you didn't -- you didn't care if you heard his voice or

15   not?

16   A   Well, I did.  I was bringing him back to Homan Square to

17   process him.  I was going to talk to him there.

18          THE COURT:  Do you mind if I ask a question?

19          MR. SULLIVAN:  Sure, Judge.

20          THE COURT:  Do you mind if I ask a question?

21          MR. HAXALL:  No, sir.

22          THE COURT:  When you were given the arrest packet, was

23   that the day before, Agent?

24          THE WITNESS:  I believe so, yes.

25          THE COURT:  Were you given any physical description of

Bagley - Cross by Sullivan

1    Mr. Johnson?

2           THE WITNESS:  I believe there was a photograph.

3           THE COURT:  You saw a photograph of him?

4           THE WITNESS:  Correct.  Yeah, I believe so.

5           THE COURT:  Were you given his height and weight,

6    anything like that, his age?

7           THE WITNESS:  I believe so, but I'm not positive, yes.

8           THE COURT:  Okay.

9    BY MR. SULLIVAN:

10   Q    Now, sir, when -- I believe you stated that on the 21st,

11   about 9:30 in the morning, you were not at 11242 when you first

12   got a call to go to that address, correct?

13   A    I don't understand that question.

14   Q    Well, let me put it this way.

15   A    Okay.

16   Q    You said you received a phone call, or you received notice,

17   that the Chicago police had Mr. Johnson at that address.

18   A    That's correct.

19   Q    So you weren't at the address when --

20   A    Not initially, no.

21   Q    -- when other officers took him into custody.

22   A    Correct.

23   Q    How long was Mr. Johnson in custody before you arrived at

24   that address?

25   A    I don't know for sure.  It wasn't very long, but I don't

Bagley - Cross by Sullivan

1   know.

2   Q    How long were you present in the residence before you took

3   him out and put him in the car?

4   A    He had to dress.  A few minutes.  Ten maybe.

5   Q    Then you took him out, put him in the car.  And at the time

6   you put the CD in the dash, did you -- what specifically did

7   you say to Mr. Johnson?

8   A    I said, "I'm going to play a CD."

9   Q    Okay.  Let me ask.  When you were in the house with

10  Mr. Johnson, did you ever ask him a hypothetical question that

11  you recall?

12  A    I don't recall.

13  Q    Did you ever ask him what 42 plus 42 is?

14  A    42 plus 42?  I don't recall.

15  Q    Okay.  Do you have some memory of the five conversations on

16  that disc that you were -- you listened to three, four times

17  before you arrested Mr. Johnson?

18  A    Not really, no.

19  Q    Well, let me ask -- let me see if this refreshes your

20  recollection.

21       Is there some difficulty by one or more of the

22  participants in one of those conversations adding 42 and 42 and

23  either getting 86 or 82?

24            MR. HAXALL:  Objection.  Relevance.

25            THE COURT:  Overruled.

Bagley - Cross by Sullivan

1       THE WITNESS:  There -- in one of the conversations,

2   there was some math they -- the two participants didn't agree

3   on.  Correct, I do recall that.

4   BY MR. SULLIVAN:

5   Q    Do you recall -- now do you recall asking Mr. Johnson when

6   you first met him in the house at 11242, did you ask him about

7   that math problem, that math difficulty that the two parties

8   were having?

9   A    I don't recall, no.

10  Q    Now, other than the -- let's see.  Let me go backwards.

11      From the -- after Mr. Johnson said that there was some

12  information about some murders he might know about, did you

13  participate or hear any statements Mr. Johnson made to other

14  agents about any murders?

15  A    No, I did not.

16  Q    Did you ever tell Mr. Johnson while he was in the car or

17  while you were driving him to Homan Square that now was the

18  time for him to think about whether he was going to cooperate

19  and whose side he was going to be on?

20  A    I don't recall.

21  Q    Is it possible you said that?

22  A    I don't know.

23  Q    Well, let me just go through.  If I may summarize, the --

24  at some point in time, you did formally ask Mr. Johnson

25  questions, interrogate him?

Bagley - Redirect by Haxall

1  A   Yes.

2  Q   And was that -- did that start before or -- well, other

3  than biographical questions, did those other questions start

4  before or after he signed the *Miranda* warning?

5  A   They were after.

6          MR. SULLIVAN:  If I might have a moment, your Honor?

7          THE COURT:  Yes.

8          MR. SULLIVAN:  If I might have a moment.

9          THE COURT:  Yes.

10         MR. SULLIVAN:  Who's got the picture?

11         Let me just look through this for a minute.

12         THE COURT:  We're off the record.

13     (Off-the-record discussion.)

14 BY MR. SULLIVAN:

15 Q   Agent Bagley, let me show you Government Exhibit 4 again.

16         Did Mr. Johnson identify anyone else in there?  And I

17 don't mean write near their name or anything else.  But did he

18 tell you he knew anybody else in there?

19 A   No, I don't recall that.

20 Q   Okay.

21         MR. SULLIVAN:  Nothing further, Judge.

22         THE COURT:  Mr. Haxall or Ms. Mecklenburg, any further

23 redirect?

24         MR. HAXALL:  Yes.

25                         REDIRECT EXAMINATION

Bagley - Redirect by Haxall

BY MR. HAXALL:

Q    Now, at the time you played the CD for the defendant in the car, did you believe that you would have the opportunity to hear him speak later for the purpose of voice identification?

A    Yes.

Q    What did you think was going to happen where you could do that?

A    Well, I knew I was going to process him.

Q    And did you anticipate you were going to ask him questions related to that processing?

A    Yes, I did.

Q    Is the only way to do a voice identification to ask somebody questions about the specific facts of their case?

A    No.

Q    Can you ask them -- talk to them about the Bears or the Cubs to do a voice ID?

A    Yes.

Q    Now, the defendant made a one-sentence statement after hearing that CD.  Is that correct?

A    Correct.

Q    Did you ask him any follow-up questions in an effort to get him to say more?

A    No, I did not.

Q    When you first arrived and took possession -- or took custody of the defendant from the CPD officers, did you

Bagley - Redirect by Haxall

1  recognize him as the individual in the photo that you had been

2  previously provided for Javon Johnson?

3  A   I recognized him in the photo.  I asked him his name.  To

4  answer your question, yes.

5  Q   Okay.  And when you asked him his name, how did he respond?

6  A   "Javon Johnson."

7  Q   So you were certain at that time that you had the proper

8  person for the arrest warrant?

9  A   Yes, I was.

10 Q   Now, I believe you indicated that you wanted to let the

11 defendant know about -- or you played the CDs -- the CD to make

12 him aware of some of the evidence against him.  Is that

13 correct?

14 A   Yes.

15 Q   How is that beneficial to your investigation?

16 A   Because now he knows why he's being arrested.

17 Q   Later, post-*Miranda*, when you do the interview, is it

18 helpful to you that he's already heard that CD?

19 A   It's helpful that he knows why he's being arrested, yes.

20 Q   Is that why you played the CD for him?

21 A   Yes, sir.

22         MR. HAXALL:  If I could have a moment, please.

23         THE COURT:  Yes.

24         MR. HAXALL:  No other questions.

25         THE COURT:  Any recross?

Bagley - Recross by Sullivan

1          MR. SULLIVAN:  Judge, just a couple.

2          THE COURT:  Asha, would you ask -- Asha, would you ask

3    Mel to come in?

4          THE LAW CLERK:  Yes.

5          THE COURT:  Oh, that's all right.  Here.  I'll call

6    her.

7          I got her, Asha.

8          You may proceed, Mr. Sullivan.

9          MR. SULLIVAN:  Thank you, Judge.

10                    RECROSS-EXAMINATION

11   BY MR. SULLIVAN:

12   Q   In response, in following up on just what Mr. Haxall asked

13   you in the last couple questions, you knew that in order to

14   make a voice identification, Mr. Johnson didn't have to hear

15   the CD, correct?  Only you had to hear the CD and you had to

16   hear his voice.  He didn't need to hear it for you to identify

17   his voice.

18   A   That's correct.

19   Q   And I believe you previously said that -- was it

20   Ms. Mecklenburg who gave you the disc and told you to play it?

21   A   It was in the packet, yeah.  It was part of the briefing,

22   correct.

23   Q   And you were told to play it for the defendant?

24   A   Yes.

25          THE COURT:  Can I ask a question?  Would you mind?

Bagley - Recross by Sullivan

1          MR. HAXALL:  No, sir.

2          THE COURT:  I'm not clear.  It's your testimony that

3    when you arrested him, he told you his name, so you knew you

4    had the right person.  Is that right?

5          THE WITNESS:  And from the photograph, correct.

6          THE COURT:  And from the photograph.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And when you spoke to him in the -- at --

9    in the booking area, getting biographical information, he

10   answered your questions then.  Isn't that right?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  So you heard his voice at that time.

13         THE WITNESS:  While -- yes, while I was processing

14   him.

15         THE COURT:  Why did you have to make a voice

16   identification almost immediately after his arrest?

17         THE WITNESS:  I didn't.

18         THE COURT:  Well, isn't that what you told us the

19   reason why you played the CD?

20         THE WITNESS:  No.  I believe I said I played the CD so

21   he would know the evidence against him.

22         THE COURT:  Excuse me.  Hold on one second.

23         Well, didn't you tell us that you were told by

24   Ms. Mecklenburg to take the CD so you could do a voice

25   identification?

Bagley - Recross by Sullivan

1        THE WITNESS:  Yes.

2        THE COURT:  Thanks.

3        Okay.  You may inquire.

4        MR. SULLIVAN:  That was my last question, Judge.

5   BY MR. SULLIVAN:

6   Q    Ms. Mecklenburg gave you the CD with the packet and told

7   you to play it for him and then make the voice identification

8   when he responded to the CD?

9   A    No.  It was two separate requests.

10  Q    She told you to play it for him?

11  A    Yes.

12  Q    And you anticipated after hearing it he would say

13  something?

14  A    No, I did not.

15  Q    But you told him to listen to it, right?

16  A    Well, I said he could listen to it.  And whether he did or

17  not, I don't --

18  Q    And you didn't tell him, "Listen to it, but don't worry.

19  You don't have to say anything afterwards because you've been

20  arrested," did you?

21  A    I did not say that, no.

22       MR. SULLIVAN:  Okay.  Nothing further, Judge.

23       THE COURT:  Anything further?

24       MR. HAXALL:  No, your Honor.

25       THE COURT:  Very well.  You may step down, Agent.  But

1    leave the lavalier here, if you would.

2              THE WITNESS:  Thank you for reminding me.

3         (Witness excused.)

4              THE COURT:  Mel -- we're on the record.  What was

5    that, new trial date was October 29th?

6              MR. HAXALL:  Yes, your Honor.

7              MS. MECKLENBURG:  Yes, your Honor.

8              THE COURT:  Okay.

9              MS. MECKLENBURG:  I spoke with Mr. Netols, who has

10   something scheduled that day.  He did inform me that he would

11   not be prepared to go that day for health reasons; and,

12   therefore, he said that if it was okay, if the Court approved,

13   we could then schedule this during that time.

14             THE COURT:  "That day," you mean that earlier date

15   that we had picked of October 15th?  That's inconvenient for

16   him, I take it?

17             MS. MECKLENBURG:  Yes, your Honor.  He's not going to

18   be --

19             THE COURT:  Oh, is October 29th convenient for you and

20   Mr. Netols and --

21             MR. SULLIVAN:  Yes.

22             MS. MECKLENBURG:  It works for us, yes.

23             THE COURT:  Okay.  And it's convenient for you?

24             MR. SULLIVAN:  Yes, Judge.

25             THE COURT:  Matter will be continued to October 29th

1    at 9:00 a.m. for trial.

2            Does the state -- does the government have a motion?

3            MR. HAXALL:  Yes, to exclude time until that date.

4            THE COURT:  Any objection?

5            MR. SULLIVAN:  No objection.

6            THE COURT:  All right.  Based on the history of this

7    case and these developments, I find -- in particular, motion to

8    suppress -- I find that it is in the interest of justice that

9    time be excluded to October 29th, 2012, and the matter be

10   continued for jury trial at 9:00 a.m. that day.

11           Okay.  Do you want to --

12           We're off the record.

13       (Off-the-record discussion.)

14           MR. SULLIVAN:  Judge, I'm thinking there might be one

15   more witness I was considering.

16           THE COURT:  Oh, I'm sorry.

17           Do you have any more witnesses?

18           MR. HAXALL:  No.

19           MR. SULLIVAN:  I was considering calling

20   Ms. Mecklenburg, asking her what she told the agent.

21           THE COURT:  All right.  Ms. Mecklenburg?

22           MR. HAXALL:  Objection.

23           MS. MECKLENBURG:  We would object, your Honor.

24           THE COURT:  Well, I think it's relevant.  What would

25   be the basis of the objection?

1           MS. MECKLENBURG:  It's not what I told the agent; it's

2     what he believed.  And he's --

3           THE COURT:  Hold on.  Hold on.  Wait, wait, wait.

4     Let's not make a statement here in front of the agent.

5           No, I think you can -- you can stay right there.

6     Would you raise your right hand, Ms. Mecklenburg.

7        (Witness duly sworn.)

8           THE WITNESS:  I do.

9           THE COURT:  All right.  You may inquire, Mr. Sullivan.

10          MR. HAXALL:  Judge, if I could just note.

11          First of all, Agent Bagley, could you step out.

12    Thanks.

13          THE COURT:  I'm sorry?

14          MR. HAXALL:  First I was going to ask the agent to

15    step out in case --

16          THE COURT:  No, it's all right.  You can stay in the

17    room, Agent.

18          MR. HAXALL:  Oh, okay.

19          And, Judge, just for the record, we are objecting to

20    Ms. Mecklenburg being called as a defense witness in this

21    matter.

22          THE COURT:  All right.  I don't know.  What's the

23    basis of the objection?

24          MR. HAXALL:  Your Honor, there is no relevance to

25    Ms. Mecklenburg's testimony, even -- no matter what she

Mecklenburg - Direct by Sullivan

1    testifies to, the relevant factor is -- first of all, it's an

2    objective standard.  It's not even the agent's subjective

3    belief on his goal in playing that CD.

4            And certainly what the assistant told him is

5    irrelevant.  It's what his understanding of that was, to which

6    he's already testified.

7            THE COURT:  Well, might what she said have some

8    bearing on what he understood?  Wouldn't that be, arguably,

9    relevant?

10           MR. HAXALL:  If he misunder -- whether or not --

11   what --

12           THE COURT:  What she said might have some bearing on

13   what he understood.  Would you agree with that?

14           MR. HAXALL:  Only as it comes from the agent, not from

15   the assistant.

16           THE COURT:  Your objection is overruled.

17           You may ask a question.

18           MR. SULLIVAN:  Thank you, Judge.

19           Judge, would you like her to take the --

20           THE COURT:  No.

21           MR. SULLIVAN:  Okay.

22           THE COURT:  You can stay right there, Ms. Mecklenburg.

23           SHERI MECKLENBURG, DEFENDANT'S WITNESS, SWORN

24                         DIRECT EXAMINATION

25   BY MR. SULLIVAN:

Mecklenburg - Direct by Sullivan

1   Q   Ms. Mecklenburg, on I think it was the 20th of June,

2   2011 --

3   A   Right.

4   Q   -- did you give Agent Bagley an arrest packet?

5   A   No.

6   Q   Who did?

7   A   I -- I know it would be an agent.  I don't know exactly

8   whom.

9   Q   Were you in charge of passing out the instructions for the

10  arresting officers that day?

11  A   I did not pass out instructions.

12  Q   Did you give instructions?

13  A   I spoke to the agents who were doing the takedown, yes.

14  Q   Okay.  And were you aware that there was a CD in the arrest

15  packages?

16  A   Yes.

17  Q   And did you tell the agents what to use the CD for?

18  A   Yes.

19  Q   Did you tell the agent to play the -- did you tell Agent

20  Bagley to play the CD for Javon Johnson?

21  A   I did not speak directly to Agent Bagley.  I spoke to a

22  roomful of people.

23  Q   Okay.

24  A   I assume Agent Bagley was --

25          THE COURT:  Was Agent Bagley in the room,

Mecklenburg - Direct by Sullivan

1    Ms. Mecklenburg?

2              THE WITNESS:  I -- I don't recall.  But I'm sure he

3    was.

4              THE COURT:  Okay.

5              THE WITNESS:  I'm sure he was.

6              THE COURT:  Okay.

7              Go ahead.

8    BY MR. SULLIVAN:

9    Q    Did you tell him what to do with the CD, him and the other

10   agents in the room?

11   A    Yes.

12   Q    Did you tell him to play the agent -- play the CD for the

13   person they were arresting?

14   A    I know that I spoke to them about using it for the voice

15   ID.  I do not recall if I -- I personally gave them specific

16   instructions about the laying out the evidence, but I believe

17   that I did.  I believe that I told them that they could lay out

18   the evidence for the person.

19   Q    And did you tell them they were supposed to do that before

20   or after they gave the subjects, the people they were

21   arresting, *Miranda* warnings?

22   A    See, I'm getting mixed up in some ways with what I know of

23   the law and what I remember I said.

24             THE COURT:  Just try to recall what you said and when

25   you said it.

Mecklenburg - Direct by Sullivan

1      THE WITNESS:  I know that -- I knew that the law was

2  that they could lay out the evidence before Mirandizing.

3      THE COURT:  What did you tell Agent --

4      THE WITNESS:  So I just don't recall exactly how I --

5  what I exactly said.

6  BY MR. SULLIVAN:

7  Q   And did you tell the agents they could play the CD before

8  the -- giving the *Miranda* warnings?

9  A   My -- my problem is I don't remember if I specifically

10  addressed that issue.  But I knew that they could, so I might

11  have.

12  Q   Did you suggest to the agents that they lay out the

13  evidence by playing the CD in an effort to elicit some sort of

14  response from the people they were arresting?

15  A   Absolutely not.

16  Q   But you told them you did want them to hear the subjects'

17  voices?

18  A   One has nothing to do with the other.  Playing the C -- I

19  never told him that playing the CD for the defendant -- for the

20  arrestee had anything to do with the voice ID, but that they

21  could lay out the evidence for the arrestee.

22      But the voice ID would be separate.  That would be in

23  booking him.

24  Q   But you told the agents that they needed to hear -- in

25  order to make the identification, they needed to hear the

Mecklenburg - Direct by Sullivan

1    defendants' voices.

2    A    Yes.  And in booking, they would do that.

3    Q    You told them only to listen to them in booking?

4    A    I didn't tell them only to listen to them in booking, but

5    we talked about how when you -- when you do the booking, listen

6    very carefully because that's what you're going to do your

7    voice ID from and then any subsequent discussions.

8    Q    Did you tell the agents when to lay out the evidence for

9    them?  Before they got to booking?

10   A    No.

11   Q    Did you tell them to do it before they got to *Miranda*

12   warnings?

13   A    I think I already answered that the best that I can

14   remember.  I don't think I specifically told them they had to

15   or they didn't have to, but that they could do it.  They could

16   lay out evidence without an interrogation.

17   Q    Okay.  And -- oh.  So based upon your interpretation of the

18   law, you advised them that they could make statements to the

19   witnesses laying out the evidence, maybe even including playing

20   the CD, without, from your conclusion, that being an

21   interrogation of the defendant.

22   A    I don't remember saying that exact thing, but I know that's

23   my understanding of the law, yes.  Did I say what you're

24   saying?  I don't know that I phrased it quite the way you're

25   saying it.

Mecklenburg - Cross by Haxall

1   Q    Okay.  For -- did you give any instructions about giving

2   *Miranda* warnings only after the booking process had taken

3   place?

4   A    No, I did not give those instructions.

5              MR. SULLIVAN:  Nothing further, Judge.

6              THE COURT:  Mr. Haxall --

7              MR. HAXALL:  Yes, I do.

8              THE COURT:  -- do you have any questions of

9   Ms. Mecklenburg?

10             MR. HAXALL:  I do.

11                       CROSS-EXAMINATION

12  BY MR. HAXALL:

13  Q    Ms. Mecklenburg, during the briefing, approximately how

14  many law enforcement officers were present in the room?

15  A    My gosh.  There had to be a hundred, at least, I would say

16  because we were picking up 30-something people, and each team

17  had multiple officers on it.  So I would say at least a

18  hundred.

19             And with my apologies to Agent Bagley, that's why I

20  just don't remember him specifically.  But I didn't want you to

21  think, like, I sat down with Agent Bagley individually.

22  Q    And in the course of this meeting with all of these law

23  enforcement officers, did you address numerous issues in

24  addition to the voice identification CDs?

25  A    Yes.

Mecklenburg - Cross by Haxall

1    Q    What were some of those general issues?

2            THE COURT:  Well, I don't --

3            THE WITNESS:   I don't --

4            THE COURT:  Go ahead if you want, but I think --

5            MR. HAXALL:  Okay.

6            THE WITNESS:  I don't really remember.

7            MR. HAXALL:  I'll withdraw the question.

8    BY MR. HAXALL:

9    Q    Was it your intention when you gave out those CDs to the

10   team leaders to get them to play them in a way to circumvent

11   *Miranda*?

12   A    Of course not.

13   Q    Was it your intention that those CDs could be played so the

14   defendants would be aware of the nature of the evidence against

15   them?

16   A    That was part of the reason for the CDs, absolutely.

17   Q    Okay.  Now, there are two independent grounds.  One is so

18   the agents could listen to the CDs to do a voice

19   identification.

20   A    That's right.

21   Q    The other is they had available as -- for use to play for

22   the defendants so they would know the evidence against them.

23   A    Right.  And some agents knew the evidence because they were

24   more involved with the case, and some did not.  So you could

25   use the CD or not use the CD.

Mecklenburg - Redirect by Sullivan

1   Q    It was your belief that some defendants when they see the

2   evidence set forth in front of them are more likely to agree to

3   speak to agents and be cooperative?

4   A    Depends on the defendant.  I've seen defendants who as soon

5   as they know they're really trapped stop talking.  And some

6   realize the evidence is against them and there they are

7   recorded, and they decide -- they think about it for a while

8   and then later decide they better do what they can for

9   themselves.

10  Q    And you entrusted the agents to make that call one way or

11  the other, about playing the CD or not?

12  A    About laying out the evidence, which would or could include

13  the CD or not.

14        MR. HAXALL:  Judge, I'm kind of at a loss on this.

15  Normal situation, I would ask my trial partner if there are any

16  other questions I should pose to the witness.

17        MS. MECKLENBURG:  His trial partner would say no.

18        MR. HAXALL:  No further questions, Judge.

19        MS. MECKLENBURG:  Because whatever you say,

20  Mr. Sullivan is coming right back.

21        THE COURT:  What do you say, Mr. Sullivan?

22        MR. SULLIVAN:  Judge, just a couple questions.

23                    REDIRECT EXAMINATION

24  BY MR. SULLIVAN:

25  Q    Ms. Mecklenburg, do you know of any federal law, rule,

Mecklenburg - Redirect by Sullivan

1  criminal procedure, or anything else that requires that the

2  defendant be advised of the nature of the evidence against him

3  at the time of his arrest?

4  A    I know of the cases that we cited in our brief that allows

5  you to do that, but I --

6  Q    I understand.

7         THE COURT:  Why don't we let you folks tell me what

8  the law is other than being under oath.

9  BY MR. SULLIVAN:

10  Q    I understand.  But you don't know of any Federal Rule of

11  Criminal Procedure that says you --

12         THE COURT:  I think I've ruled on that, Mr. Sullivan.

13         MR. SULLIVAN:  Okay.  Thank you, Judge.

14  BY MR. SULLIVAN:

15  Q    You also just stated that you're aware based upon your

16  experience that setting forth the evidence for some defendants,

17  they start talking, and other defendants just shut up.

18  A    Not talking at that point.  But later when they're

19  interrogated, some realize, well, the evidence is against me.

20  I'd rather cooperate, try to help myself.

21         THE COURT:  Mr. Sullivan, why don't we move on.

22         MR. SULLIVAN:  Okay.  I have nothing further, Judge.

23         MR. HAXALL:  Nothing based on that, Judge.

24         THE COURT:  Very well.

25         Ms. Mecklenburg, you're a very good witness.

 1              MS. MECKLENBURG:  Thank you.

 2         (Witness excused.)

 3              THE COURT:  Do you want to submit some brief --

 4              MR. SULLIVAN:  Judge, I just want to talk with my

 5    client for a minute.

 6              THE COURT:  Okay.

 7              MR. HAXALL:  And, Judge, just for the record, we have

 8    no additional evidence to present.

 9              THE COURT:  Okay.  Thank you, Mr. Haxall.

10         (Mr. Sullivan conferring with the defendant.)

11         (Off-the-record discussion.)

12              THE COURT:  Folks, I have an appointment at 11 --

13              We're off the record.

14         (Off-the-record discussion.)

15              MR. SULLIVAN:  Judge, just because -- if -- I know you

16    have an 11:30 appointment.

17              THE COURT:  See you back here -- see you about 1:15?

18              MR. SULLIVAN:  1:15.

19              THE COURT:  Okay.

20              MR. SULLIVAN:  I don't know if there will be more

21    witnesses or not.

22              THE COURT:  Okay.  But 1:15 it is.  See you all then.

23              THE CLERK:  All rise.

24         (Recess at 11:29 a.m., until 8/28/12 at 1:15 p.m.)

25

1           C E R T I F I C A T E

2       I certify that the foregoing is a correct transcript of the

3   record of proceedings in the above-entitled matter.

4

5

    /s/ LAURA R. RENKE                    September 9, 2012
6   LAURA R. RENKE, CSR, RDR, CRR, CLR
    Contract Court Reporter
7   Illinois Certified Shorthand Reporter
    License No. 084-003184

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25